IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

WILLIAM SELEPACK,           )
                            )
    Plaintiff,              )
                            )
        v.                  )   1:15-cv-01227 (JCC/JFA)
                            )
OFFICER VIRGINIA NEWSOME,    )
ET AL.,                     )
                            )
    Defendants.             )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendants' Motion
to Dismiss.  [Dkt. 20.]  For the following reasons, the Court
will grant the motion.

### I. Background

In 2005, Plaintiff William Selepack ("Plaintiff")
acquired a Miniature Doberman Pinscher named Max to be trained
as his service dog.  (Compl. [Dkt. 1] ¶ 26.)  Max completed a
six-week obedience course and a year of weekend sessions to
learn to help manage Plaintiff's many physical and mental
impairments, including degenerative bone disease, extremely low
manual dexterity, and memory loss, among others.  (*Id.* ¶¶ 20-
30.)  Because Plaintiff is "physically incapable of using a
leash," Max also was trained to remain under Plaintiff's voice
control.  (*Id.* ¶¶ 36-37.)  Allowing a dog to be "not under leash

1

control" in a residential area, however, is illegal in Loudoun County, Virginia.  Loudoun Cty., Va., Ors. 612.02(m), 612.13.[1] Plaintiff's practice of leaving Max off-leash attracted scrutiny from Loudoun County Animal Control ("Animal Control").

According to public records,[2] Plaintiff received his first known conviction for violating the leash law in March 2009.  (*See* Ex. 1.)[3]  Virginia state courts again convicted Plaintiff of leash law violations on August 4, 2009; May 1, 2012; May 30, 2012; and July 18, 2012.  (*See* Exs. 4-7.)

---

[1]   The leash requirement derives from an ordinance prohibiting dogs "running at large," which is defined as follows:

> A dog running at large is a dog which is roaming, running or self-hunting off the property of its owner or custodian and is not under its owner's or custodian's immediate control.  However, in any County owned public park (except for any specifically designated 'off-leash' areas) or within any residential development in any unincorporated area of the County which has a density of two housing units or more to the gross acre, a dog shall be deemed to run at large while roaming, running or self-hunting off the property of its owner or custodian and not under leash control.

Loudoun Cty., Va., Or. 612.02(m).

[2]   As described below, the Court may consider these matters of public record without converting this motion into one for summary judgment.  *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 397 (4th Cir. 2006) (concluding that a "district court may clearly take judicial notice of these public records," including court records).

[3]   Citations to exhibits refer to documents attached to Defendants' Memorandum in Support of their Motion to Dismiss [Dkt. 20].

Plaintiff received another citation in September 2013, which caused a state court to declare Max a public nuisance due to his repeated leash law violations. (Compl. ¶¶ 49, 73-74.) The court ordered Animal Control to "seize the animal and take control of the dog and confine it for possible adoption or disposal" upon the next reported complaint. (*Id.* ¶ 74; Ex. 8.) The next complaint came only six days later, on October 1, 2013.

On that day, Animal Control Officer Virginia Newsome ("Newsome") drove by Plaintiff's home and observed Max and another dog playing off-leash in Plaintiff's garden. (Compl. ¶¶ 76-77.) Newsome allegedly "shout[ed]" out of her window, which caused both dogs to run away. (*Id.* ¶ 78.) Max returned "immediately" upon being called and Plaintiff then took the dog inside. (*Id.*) Later that evening, Newsome obtained a warrant to seize Max for violating the leash law and the public nuisance order. (*Id.* ¶ 83.) To execute this warrant, Newsome allegedly "deployed" five members of the Sherriff's Office's Rapid Response Unit ("RRU"). (*Id.* ¶ 84.) This search team allegedly held Plaintiff "at gunpoint" and twice threw him on the stairs while seizing Max. (*Id.* ¶¶ 86-89.) The enforcement of the leash law against Plaintiff, and particularly the seizure of Max, prompted parallel state criminal and federal civil litigation.

The first series of proceedings occurred in state

3

court regarding Plaintiff's criminal charges.  A Virginia
general district court found Plaintiff guilty of violating the
leash law on the day Newsome observed Max in the garden and
ordered Max to be seized and confined.  (Ex. 11.)  It is not
clear from the record if Plaintiff ever appealed this seizure
order, but Plaintiff did appeal the underlying leash law
conviction.  (Ex. 15.)  During the pendency of that appeal,
Plaintiff retained counsel who motioned for an emergency
injunction, arguing that Max is a service dog under regulations
implementing the Americans with Disabilities Act and can be
lawfully kept off-leash because of Plaintiff's disabilities.
(Ex. 13.)  The Circuit Court for Loudoun County denied the
emergency injunction and affirmed Plaintiff's conviction for
violating the leash law and the public nuisance order.  (Exs.
14, 16.)  The Virginia Court of Appeals rejected Plaintiff's
subsequent appeal as untimely, denied a motion to set aside the
judgment, and denied a petition of actual innocence.  (Exs. 17,
18, 19.)

     While appealing his criminal conviction in state
courts, Plaintiff simultaneously initiated several federal civil
lawsuits.  He filed his first federal action on December 12,
2013, seeking an emergency injunction for Max's immediate
release, a restraining order against Animal Control's
enforcement of the leash law, and a stay on his state court

proceedings.  (Compl., No. 1:13-cv-1526 (E.D. Va. filed Dec. 12, 2013), ECF. 1).  The court denied the emergency motion on December 13, 2013, and later denied a preliminary injunction motion.  Seven days later, Plaintiff filed his second federal action, seeking essentially the same relief.  (Compl., No. 1:14-cv-0049 (E.D. Va. filed Jan. 17, 2014), ECF. 1.)  The court again denied emergency injunctive relief and Plaintiff dismissed the complaint several days later.  One minute after dismissing the second action, Plaintiff filed his third federal action and motion for emergency injunctive relief.  (Compl., No. 1:14-cv-117 (E.D. Va. filed Feb. 5, 2014), ECF. 1.)  The court again denied the motion for emergency relief.  At that point, Plaintiff voluntarily dismissed his first federal lawsuit and moved to voluntarily dismiss his third lawsuit.  Instead of permitting voluntary dismissal of the third suit, the court granted defendants' motion to dismiss.  (*See* Order, No. 1:14-cv-0117 (E.D. Va. Apr. 4, 2014), ECF. 15.)  While those cases were proceeding in the Eastern District of Virginia, Plaintiff also filed a nearly identical complaint in the District Court for the District of Columbia.  (*See* Order, No. 1:14-cv-202 (E.D. Va. Sept. 29, 2014), ECF. 9.)  That case was eventually transferred and dismissed.  About a year later, Plaintiff filed the present complaint as his fifth federal action related to Max's seizure.

In the present complaint, Plaintiff seeks much of the

same relief he pursued in his prior federal actions.  Namely, he seeks declaratory and injunctive relief against the enforcement of Loudoun's leash law, and damages suffered due to the enforcement of the leash law and Max's seizure.  Plaintiff raises seven counts related to these remedies.  The first four counts allege that the Loudoun County Board of Supervisors' ("Board") passage and enforcement of the leash law violate Dillon's Rule; Virginia public policy; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12133, 12101; and the Rehabilitation Act, 29 U.S.C. § 794.  Count V alleges that Newsome violated the Fourth Amendment and 42 U.S.C. § 1983 by deploying the RRU to execute the search warrant.  Count VI alleges the Board and Newsome violated the Fifth Amendment's Takings Clause by physically seizing Max.[4]  And finally, Count VII alleges former Chief of Loudoun County Animal Control Adrienne Burton ("Burton") and current Chief Mark Stacks ("Stacks") violated § 1983 by failing to supervise Animal Control officers' use of the RRU to execute search warrants.

Defendant motioned to dismiss pursuant to the *Rooker-Feldman* doctrine, *res judicata*, qualified immunity, and failure to state a claim, among other theories.  The Court will consider

---

[4]   Plaintiff's counsel clarified at the January 21, 2016 oral argument that Count VI alleges a physical taking, rather than a regulatory taking.  Thus, this opinion evaluates Count VI in light of that clarification.

these arguments in turn.

## II. Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).  When ruling on a motion to dismiss, "the material allegations of the complaint are taken as admitted." *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). Moreover, "the complaint is to be liberally construed in favor of the plaintiff." *Id.*  Additionally, a motion to dismiss must be addressed in light of Federal Rule of Civil Procedure 8's liberal pleading standard, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  This standard does not require "detailed factual allegations," but a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Although a 12(b)(6) motion invites an inquiry into the legal sufficiency of the complaint, rather than an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint reveals the existence of a meritorious affirmative defense. *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 181 (4th Cir. 1996).

When reviewing a motion to dismiss, a court may consider not only allegations in the complaint but also "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citation omitted).   A court may also take judicial notice of public records, such as court records in earlier proceedings.   *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 397 (4th Cir. 2006).

### III. Analysis

A.        *Rooker-Feldman* Doctrine

Defendants first argue that the *Rooker-Feldman* doctrine bars subject matter jurisdiction over all counts in the Complaint.   This doctrine precludes a district court from deciding what would be, in essence, an appeal of a state-court judgment.   *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). "Because the *Rooker-Feldman* doctrine is jurisdictional, we are obliged to address it before proceeding further in our analysis." *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 195-96 (4th Cir. 2002).

The *Rooker–Feldman* doctrine occupies "narrow ground," confined only to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *Davani v. Va. Dep't of Transp.*, 434 F.3d 712 (4th Cir. 2006). This doctrine extends from 28 U.S.C. § 1257, which vests appellate review of state-court judgments solely in the U.S. Supreme Court. It is important to note, however, that the *Rooker–Feldman* doctrine and § 1257 do not "stop a district court from exercising subject matter-jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Saudi Basic*, 544 U.S. at 293. If a plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* at 293 (citation omitted). In other words, "the test is not whether the relief sought in the federal suit 'would certainly upset' the enforcement of a state court decree, but rather whether the review would 'reverse or modify' the state court decree." *Adkins v. Rumsfeld*, 464 F.3d

456, 464 (4th Cir. 2006).  The Court will now apply those principles to Plaintiff's seven-count complaint.

Counts I, II, and III are attacks on the facial validity of Loudoun County Ordinance 612.02(m) and do not implicate the *Rooker-Feldman* doctrine.  Collectively, these counts allege that the leash law is *ultra vires* under Dillon's Rule, conflicts with Virginia public policy, and violates the ADA and the Rehabilitation Act.  (Compl. ¶¶ 103-35.)  It is well recognized that *Rooker-Feldman* does not apply to facial challenges to a statute because those challenges implicate a legislative action, not any particular judicial decision.  *See Feldman*, 460 U.S. at 487 ("The respondents' claims that the rule is unconstitutional . . . do not require a review of a judicial decision in a particular case."); *Willner v. Frey*, 421 F. Supp. 2d 913, 923 (E.D. Va. 2006), *aff'd*, 243 F. App'x 744 (4th Cir. 2007) ("The rationale of *Feldman* makes clear that the question whether the Willners may bring their claims in federal district court depends on whether their challenge to Virginia's adverse possession statute is facial or as-applied.").  Thus, the *Rooker-Feldman* doctrine does not bar Plaintiff's facial challenges in Counts I, II, and III.

The as-applied challenge to the leash law in Count IV also does not implicate *Rooker-Feldman*.  In this count, Plaintiff alleges that the Board and Newsome's enforcement of

the leash law against him violated the federal laws mentioned above.  (Compl. ¶¶ 135-52.)  Although the state court played a role in this enforcement by finding Plaintiff guilty of the citations he received, the state court's judgment is not the source of the injury alleged in Count IV.  The sources of the injury alleged are the Board and Newsome.  *Rooker-Feldman* requires that a plaintiff's injuries be "produced by the state-court judgment and not simply ratified, acquiesced in, or left unpunished by it."  *L.A.M. Recovery, Inc. v. Dep't of Consumer Affairs*, 184 F. App'x 85, 88 (2d Cir. 2006) (citation omitted).  The state court merely ratified the Defendants' leash law enforcement actions.  Thus, Count IV does not implicate *Rooker-Feldman*.  *See Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013) (concluding *Rooker-Feldman* did not bar claim that municipality enforced a local ordinance in violation of the U.S. Constitution).

Similarly, the § 1983 claims in Counts V and VII do not implicate the *Rooker-Feldman* doctrine.  Those counts allege that Newsome violated the Fourth Amendment by deploying the RRU to execute the search warrant and Defendants Burton and Stacks are also liable as Newsome's supervisors.  These claims accrued before any state-court judgment and do not seek to modify or reverse any of Plaintiff's state court convictions.  The force used during the search has no bearing on the state court's

11

determination that Max is a public nuisance.  Therefore, Counts V and VII are not barred by *Rooker-Feldman*.

Count VI's allegations of a physical taking in violation of the Fifth Amendment, however, do implicate *Rooker-Feldman*.  When a court order forms the basis for a taking claim, it is the court order that causes the alleged injury.  *See Willner v. Frey*, 243 F. App'x 744, 746 (4th Cir. 2007).  Thus, entertaining the taking claim would require a review of the state court judgment, implicating *Rooker-Feldman*.  *Id.*  The Tenth Circuit applied these principles in *Campbell v. City of Spencer*, 682 F.3d 1278 (10th Cir. 2012), where the court concluded that *Rooker-Feldman* precluded it from considering a taking claim based on two municipalities seizing the plaintiff's horses for animal abuse.  The Tenth Circuit concluded that "the deprivation of property that was allegedly without just compensation or due process was the deprivation ordered by the state court.  Thus, this claim has merit only if the state-court forfeiture order was unlawful on the record before the court." *Id.* at 1284.  Accordingly, *Rooker-Feldman* barred the plaintiff's taking claim.

The circumstances of the present case lead to the same conclusion as *Campbell*.  Here, a Virginia state court ordered Max to be seized if Plaintiff committed another violation of the leash law.  In its September 25, 2013 order, the state court

said "[i]f another incident is reported to Animal Control, the department shall seize the animal and take control of the dog and confine it for possible adoption or disposal." (Order [Dkt. 21-8].) When another incident occurred days later, the state court ordered that "an Animal Control Officer for the County of Loudoun shall seize the dog, . . . confine the dog at the Animal Shelter for possible adoption by another owner or disposal." (Order [Dkt. 21-11].) Thus, as in *Campbell*, to the extent there was a deprivation of Plaintiff's Fifth Amendment right, it occurred due to the state court's order and "has merit only if the state-court forfeiture order was unlawful on the record before the court." *Campbell*, 682 F.3d at 1284. *Rooker-Feldman* bars this Court from entertaining such an action. Accordingly, Count VI is beyond this Court's subject matter jurisdiction.

In conclusion, the Court finds that *Rooker-Feldman* bars only Count VI. All remaining Counts are properly before this Court's jurisdiction. *See* 28 U.S.C. §§ 1331, 1367. Thus, the Court may proceed to Defendant's affirmative defenses and substantive arguments for dismissal.

B.      Evidentiary Issues

Before considering Defendants' additional arguments, the Court must define the scope of the factual record before it. Both parties submitted affidavits and exhibits to the Court. Reference to some of those documents would convert this

13

proceeding into a motion for summary judgment, which the Court will not do before parties have benefitted from discovery.  *See McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) ("In general, summary judgment should only be granted after adequate time for discovery.").

To comply with the limitations of a motion to dismiss, the Court will only consider the exhibits attached to the Complaint and the court records[5] Defendants attached to their memorandum in support of dismissal.  *See Philips*, 572 F.3d at 180; *Trimble Navigation*, 484 F.3d at 705; *Witthohn*, 164 F. App'x at 397.  The Court will not, consider affidavits from Newsome or the video allegedly recording the October 1, 2013 search of Plaintiff's home.  Those exhibits are relevant to Plaintiff's claims, but the exhibits themselves are not referenced in the Complaint and are not integral to the Complaint.

The Court turns now to Defendants' affirmative defense of *res judicata*.

C.      *Res Judicata*

Defendants contend that Judge Hilton's April 4, 2014 dismissal of Plaintiff's third lawsuit should bar the present lawsuit.  Because the prior judgment was rendered in federal court, federal law governs the application of *res judicata* here.

---

[5]      These court records include Exhibits 1-8, 12-28. (Exs. 1-8, 12-28 [Dkt. 20].)

14

*Shoup v. Bell & Howell Co.*, 872 F.2d 1178, 1179 (4th Cir. 1989). Under federal law, *res judicata* bars the litigation of a claim when the following elements are present: "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits." *Clodfelter v. Republic of Sudan*, 720 F.3d 199, 210 (4th Cir. 2013) (quoting *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004)).  When these elements are met, declining to relitigate a claim "encourages reliance on judicial decisions, bars vexatious litigation, and frees the courts to resolve other disputes." *Brown v. Felsen*, 442 U.S. 127, 131 (1979).

Looking to the first *res judicata* factor, Plaintiff does not dispute the presence of a prior final judgment on the merits.  Judge Hilton delivered that final judgment when he dismissed Plaintiff's 2014 complaint pursuant to 12(b)(6) for failure to state a claim.  (*See* Order, No. 1:14-cv-0117 (E.D. Va. Apr. 4, 2014), ECF. 15.)  Judge Hilton noted that Plaintiff "does not allege sufficient facts to show that the Defendants' animal control laws are inconsistent with the ADA and its implementing regulations" and "the ordinances do not exceed the scope of the County's authority under Virginia law."  *Id.* at 4. This dismissal constitutes a final judgment on the merits for *res judicata* purposes.  *See* Fed. R. Civ. P. 41(b); *Shoup*, 872

F.2d at 1180 (interpreting Rule 41(b) to deem dismissal on substantive grounds to be "upon the merits" when order did not specify dismissal was "without prejudice").

As to the second factor, all of Plaintiff's current counts fall within the cause of action alleged in the 2014 complaint.[6]  The Fourth Circuit "follow[s] a 'transactional' approach when considering whether causes of action are identical: 'As long as the second suit 'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment,' the first suit will have preclusive

---

[6]    Defendant raised the affirmative defense of *res judicata* to only Counts I, II, III, and IV. (*See* Mem. in Supp. at 8.)  The Court exercised its discretionary authority to *sua sponte* consider the application of *res judicata* to Counts V, VI, and VII.  *See Clodfelter*, 720 F.3d at 208.  The Court took this extraordinary step for several reasons.  First, the need for conservation of judicial resources, finality, and consistency with prior judgments are particularly strong in this case.  This is Plaintiff's <u>fifth</u> federal lawsuit in two years raising similar, if not identical, allegations.  In all five of these cases, Plaintiff also filed "emergency" motions for injunctive relief.  Plaintiff twice voluntarily dismissed his complaint after the court denied preliminary relief.  In the present case, Plaintiff withdrew his emergency motion the day before a scheduled hearing after Defendant revealed this case's extensive unfavorable procedural history.  These motions and cases have consumed extensive judicial resources and resolution is necessary.  Second, Defendants put Plaintiff and the Court on notice of the application of *res judicata* by raising it as an affirmative defense as to some of Plaintiff's counts.  *See Arizona v. California*, 530 U.S. 392, 412 (2000) ("[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte*, even though the defense has not been raised.").  Lastly, no surprise will result from this *sua sponte* action because the Court questioned Plaintiff during the January 21, 2016 oral argument about the application of *res judicata* to all counts.

effect.'"  *Clodfelter*, 720 F.3d at 210 (quoting *Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009)).  Under this approach, "the doctrine of *res judicata* not only bars claims that were actually litigated in a prior proceeding, but also claims that could have been litigated." *Pueschel v. United States*, 369 F.3d 345, 355 (4th Cir. 2004).

The series of transactions set forth in the 2014 complaint encompasses all of the counts in the current Complaint.  The 2014 complaint alleges a series of enforcement actions of the leash law against Plaintiff and Max.  The last enforcement action alleged is Max's seizure by Animal Control on October 1, 2013.  All of the current counts fall within this same time period and relate to the same subject matter.  Counts I, II, III, and IV essentially mirror the 2014 complaint's allegations that the leash law conflicts with state and federal law.  Counts V, VI, and VII raise claims stemming from Max's seizure as the culmination of the unlawful enforcement actions. Because all of the current complaints fall within the same series of transactions alleged in the 2014 complaint, the second *res judicata* factor is satisfied.

The last *res judicata* element is also satisfied because there is an identity of parties between the 2014 case and the present lawsuit.  Under this factor, *res judicata* "binds only parties or their privies."  *Nash Cty. Bd. of Ed. v.*

*Biltmore Co.*, 640 F.2d 484, 493 (4th Cir. 1981).  A current party may be in privity if he "is so identified in interest with a party to former litigation that he represents *precisely the same legal right* in respect to the subject matter involved." *Andrews v. Daw*, 201 F.3d 521, 525 (4th Cir. 2000).  Under this definition, a "party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity."  *Id.* (quoting Restatement (Second) of Judgments § 36(2) (1982)).

On the plaintiff side of the lawsuit, there is no dispute that identity of parties exists.  William Selepack is the plaintiff in both the 2014 lawsuit and the present suit. Therefore, identity of plaintiffs exists.

The defendant side of the lawsuit requires more analysis.  The 2014 complaint named as defendants "Loudoun County Animal Control" and "Loudoun County Government."  The Court will consider each of these defendants in turn.  First, several of the current defendants are in privity with Loudoun County Animal Control.  The current Complaint names Newsome, Burton, and Stacks as defendants in their official capacities as Loudoun County Animal Control employees.  Such "official capacity" suits "generally represent only another way of pleading an action against an entity of which an officer is an

18

agent and in essence are suit[s] against the entity." *Daw*, 201
F.3d at 525.  For this reason, officials sued in their official
capacity are in privity with the entity which they represent.
*See Mears v. Town of Oxford, Md.*, 762 F.2d 368, 371 n.3 (4th
Cir. 1985) (finding, under Maryland law, town employees sued in
their official capacity as representatives of the town were in
privity with town in prior suit); *Headley v. Bacon*, 828 F.2d
1272, 1279 (8th Cir. 1987) ("Litigation involving the government
is generally binding with respect to government officials who
are sued in their official capacities in later actions."); *see
also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)
("[A] suit against a state official in his or her official
capacity is not a suit against the official but rather is a suit
against the official's office.").  Accordingly, Newsome, Burton,
and Stacks are in privity with Loudoun County Animal Control in
the 2014 suit and benefit from *res judicata* in the claims
against them in their official capacities.

     The above conclusion, however, does not apply to
Newsome, Burton, and Stacks in their individual capacities
because these *individuals* are not privies of Loudoun County
Animal Control.  *See Daw*, 201 F.3d at 523 ("[A] government
employee in his official capacity is not in privity with himself
in his individual capacity for purposes of res judicata.").

Therefore, Newsome, Burton, and Stacks do not benefit from *res judicata* as to the claims against them as individuals.

Second, the Board is in privity with the "Loudoun County Government." The 2014 complaint named "Loudoun County Government" as defendant and referenced the County Administrator and the Board of Supervisors within the section of the complaint discussing parties. Under Virginia law, the "governing body" of a county is "the board of supervisors." Va. Code Ann. § 15.2-102. Furthermore, a board of supervisors may "provide for the performance of all the government functions of the county." *Id.* § 15.2-403. The county administrator, by contrast, is appointed by the Board and "may be removed at the pleasure of the board." *Id.* § 15.2-406. Thus, Plaintiff's naming of the "Loudoun County Government" as a prior defendant either attempted to bring suit against the Board or attempted to and did name a defendant sharing an identical interest as the Board for purposes of passing and enforcing county ordinances. Accordingly, the Court finds that the Board shares identity with a defendant in the 2014 case and benefits from *res judicata*.

To summarize this section on *res judicata*, the Court finds as follows: (1) all counts against Defendants Newsome, Burton, and Stacks in their official capacities as Loudoun County Animal Control officials are dismissed as barred by *res judicata*; (2) all counts against Defendants Newsome, Burton, and

20

Stacks in their individual capacities are *not* barred by *res judicata*; and (3) all counts against the Loudoun County Board of Supervisors are barred by *res judicata*.  The above conclusions fully dispose of Counts I, II, III, and IV and partially dispose of Counts V, VI, and VII.  The Court will now proceed to the remaining partial counts.

D.        Count V: Excessive Force by Newsome

Count V alleges that Newsome violated § 1983 and the Fourth Amendment's prohibition on excessive force by deciding to deploy members of a Rapid Response Unit ("RRU") to execute the warrant for Max's seizure.  This claim is exclusively limited to Newsome's *decision to deploy* the RRU and does not involve allegations regarding the RRU's use of force during the search. No RRU officer is named as a defendant and Newsome's conduct during the search is not alleged to have violated Plaintiff's constitutional rights.

Defendants argue that Count V should be dismissed under 12(b)(6) because it fails to sufficiently allege that "Newsome had control or authority over the Sheriff's Office," which is necessary to show that the order to use the RRU came from Newsome.  (Mem. in Supp. at 11.)  Alternatively, Defendants argue that Newsome is entitled to qualified immunity in her individual capacity.  Because the Court agrees that Newsome is qualifiedly immune, it does not reach the question of whether

21

Plaintiff has sufficiently pleaded a violation of the Fourth Amendment.

Qualified immunity protects government officials from individual liability, provided that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

There are two steps in the qualified immunity analysis. Step one is to determine if the plaintiff has shown a violation of a constitutional right. Step two is to determine if that right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. The answer to this second step depends on whether "it would be clear to an objectively reasonable officer that his conduct violated [the] right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). Courts can exercise their sound discretion when deciding which of the two steps to address first. *Pearson*, 555 U.S. at 236.

The Supreme Court has emphasized that "[b]ecause qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Furthermore, a "driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials [will] be resolved prior to discovery." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)) (internal quotations omitted). Therefore, qualified immunity should be addressed at the earliest possible stage of litigation and "may be raised in a motion to dismiss." *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (citing *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)).

In light of these principles, the Court finds that Newsome is entitled to qualified immunity because Plaintiff has not proven a violation of "clearly established" law. The constitutional right raised in this case is Plaintiff's right to be free from officers deciding to deploy a five member rapid response team to execute a search warrant to seize an eighteen pound dog suspected of violating a public nuisance order. *Estate of Armstrong* ex rel. *Armstrong v. Village of Pinehurst*, --F.3d--, 2016 WL 105386, at *12 (4th Cir. Jan. 11, 2016) (listing first step in "clearly established" framework as

defining the right at issue).  In October 2013, however, it was not clear that the Fourth Amendment was applicable to Newsome's decision.  Nor was it clear that Newsome's decision was excessive force, even if the Fourth Amendment applied.

Looking first to cases within this Circuit, there is substantial doubt that the Fourth Amendment would even apply to Newsome's pre-search decision about which officers to deploy.[7] In *Greenridge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991), the Fourth Circuit concluded that courts must focus their Fourth Amendment analysis on the moment a seizure or use of force occurs.  *Id.* at 791.  Under this standard, "evidence of the officer's alleged violation of police procedures" prior to an arrest is not relevant to the Fourth Amendment analysis.  *Id*. at 793.  The Fourth Circuit recently applied this limiting principle to conclude that a "police officer's pre-seizure conduct, regardless of whether it was ill-advised or violative of law enforcement protocol, is generally not relevant for purposes of an excessive force claim under the Fourth Amendment which looks only to the moment force is used."  *Gandy v. Robey*, 520 F. App'x 134, 142 (4th Cir. 2013).[8]  The Fourth Circuit

---

[7]    At this stage, the Court must accept as true that Newsome had the authority to "deploy" particular Sherriff's Office officers and exercised that authority by deploying the RRU to seize Max.
[8]    This unpublished opinion is not binding precedent in the Fourth Circuit, but still indicates the unlikely existence of

referred to a theory of "setting-in-motion" a constitutional violation as "highly dubious in the excessive force context," and found "the mere decision itself to make a surprise entry as opposed to other alternatives affords no basis for liability." *Id.* Plaintiff has cited no cases to refute this precedent.

The above cases are sufficient to conclude that the right at issue here is not clearly established in the Fourth Circuit. *See Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 407 (4th Cir. 2014) ("If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense."); *Wilson v. Layne*, 141 F.3d 111, 116 (4th Cir. 1998) (en banc) ("Thus, the decisions of the other circuit courts of appeals cannot support a conclusion that the law was clearly established in our circuit."). A review of the case law outside of this Circuit confirms that no such clearly established right existed in 2013. At that time, the Third,[9]

---

the right Plaintiff asserts here. *See Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 401 n.10 (4th Cir. 2014) (noting that unpublished opinions do not "reflect the kind of judicial disagreement that makes qualified immunity appropriate," but also that they "may reflect judicial disagreement about whether a right is in fact clearly established").

[9]    *Estate of Smith v. Marasco*, 430 F.3d 140, 149 (3d Cir. 2005) ("We stressed in *Smith I* that a decision to employ a SWAT-type team can constitute excessive force if it is not 'objectively reasonable' to do so in light of 'the totality of the circumstances.'")

Ninth,[10] and Tenth[11] Circuits appear to have applied the Fourth
Amendment to decisions to deploy aggressive, tactical search
teams to execute a warrant.  But also at that time, the Seventh
Circuit[12] had expressly declined to apply the Fourth Amendment to
"pre-seizure conduct," and in 2012 the Second Circuit[13] noted
that it had never applied the Fourth Amendment in that way, and
declined to consider the question at that time.  *See also*
*Andrade v. Chojnacki*, 65 F. Supp. 2d 431, 457 (W.D. Tex. 1999)
("[D]ynamic entry is not, in and of itself, a violation of the
Fourth Amendment.").  And in 2014, the Second Circuit found that
"there is no clearly established right in this Circuit to be
free from the deployment of a tactical team in general."
*Terebesi v. Torreso*, 764 F.3d 217, 233 (2d Cir. 2014).  From
this survey of circuit court cases, the Court cannot conclude
that it was clearly established in 2013 that the Fourth
Amendment would govern Newsome's decision to deploy a five-
member rapid response unit.

---

[10]   *Alexander v. City & Cty. of S.F.*, 29 F.3d 1355, 1366 (9th
Cir. 1994) (applying Fourth Amendment to claim that deployment
of SWAT rendered search unreasonable).
[11]   *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179,
1190 (10th Cir. 2001) ("Where a plaintiff claims that the use of
a SWAT team to effect a seizure itself amounted to excessive
force, we review the decision to use that degree of force by
'balanc[ing] the nature and quality of the intrusion on the
individual's Fourth Amendment interests against the importance
of the government interests alleged to justify the intrusion.'"
(quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985))).
[12]   *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992).
[13]   *Fortunati v. Vermont*, 503 F. App'x 78, 81 (2d Cir. 2012).

26

Even if the Fourth Amendment clearly did apply, however, it is far from clear that Newsome's use of force was excessive.  The cases cited above involved deployments of tactical force far in excess of the five-man rapid response unit Newsome deployed.  In *Overdorff*, for example, the Tenth Circuit concluded it was <u>reasonable</u> to deploy a ten-man SWAT team "dressed in green camouflage clothing with no identifying markings and hoods showing only their eyes" and three uniformed officers to execute a misdemeanor assault and reckless endangerment warrant.  268 F.3d at 1183.  In *Marasco*, the Third Circuit found it was <u>reasonable</u> to deploy a thirty-member special emergency response team "wearing riot gear and camouflage and armed with various weapons" in response to an aggravated assault, simple assault, and reckless endangerment warrant.  430 F.3d at 146, 150.  In both of those cases, officers responded to threats far more serious than those that Plaintiff or his dog posed in this case.  But also in both *Overdorff* and *Marasco*, the deployment of force far exceeded that alleged in this case.  Plaintiff has not cited to any case concluding that the decision to deploy five tactical officers, in and of itself, is unreasonable, regardless of the warrant being executed.  As such, even viewing the facts in the light most favorable to Plaintiff, he has not carried his burden of demonstrating a violation of a clearly established

constitutional right.  Accordingly, Newsome is entitled to

qualified immunity in her individual capacity as to Count V.

E.          Count VI: Fifth Amendment Taking

        The Court turns next to Count VI, which alleges that

the Board and Officer Newsome are liable under § 1983 for

physically taking Max in violation of the Takings Clause of the

Fifth Amendment of the U.S. Constitution.  The Court has already

concluded that *Rooker-Feldman* defeats subject matter

jurisdiction over this count.  As an alternative argument,

Defendants contend that Count VI should be dismissed for failure

to state a claim and that Newsome is entitled to qualified

immunity.  The Court agrees with Defendants that, even if

jurisdiction was proper, Count VI should be dismissed on

alternative grounds.

        The Fifth Amendment's taking clause, made applicable

to the states by the Fourteenth Amendment, prohibits the taking

of private property "for public use, without just compensation."

U.S. Const. amend. V.  As the Supreme Court has held, however,

the "government may not be required to compensate an owner for

property which it has already lawfully acquired under the

exercise of governmental authority other than the power of

eminent domain."  *Bennis v. Michigan*, 516 U.S. 442, 452 (1996);

*see also Keystone Bituminous Coal Ass'n V. DeBenedictis*, 480

U.S. 470, 489-93 (1987).

Max was seized pursuant to law enforcement efforts, not through a process of eminent domain.  Newsome acted pursuant to a county public nuisance ordinance that was enacted pursuant to the state's delegation of its police power.  *See* Va. Code Ann. § 3.2-6539 (authorizing localities to "adopt ordinances requiring that dogs within any such locality be kept on a leash or otherwise restrained").  There is no question that the state's police power permitted it to regulate dogs in this way. *See Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698, 704 (1897) ("Even if it were assumed that dogs are property in the fullest sense of the word, they would still be subject to the police power of the state, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens."); *see also Weigel v. Maryland*, 950 F. Supp. 2d 811, 839 (D. Md. 2013) ("[T]he right to own and keep dogs is not fundamental.").  Thus, as other courts have found in the context of animal seizures, no physical taking claim is pleaded in this Complaint.  *See Scott v. Jackson Cty.*, 297 F. App'x 623, 625 (9th Cir. 2008) (finding no physical taking claim for forfeiture of several hundred rabbits because plaintiff "never alleged that her property was taken or retained for any reason other than for law enforcement purposes"); *Porter v. DiBlasio*, 93 F.3d 301, 310 (7th Cir. 1996) (finding seizure of nine thoroughbred racehorses under animal neglect law was not a

taking because "the state's disposal of neglected animals falls within the class of property deprivations for which the Fifth Amendment does not require compensation").

Even if Count VI did sufficiently allege a Fifth Amendment violation, Defendant Newsome would be entitled to qualified immunity in her individual capacity.  As described above, defeating qualified immunity requires the plaintiff to prove that "it is sufficiently clear that every reasonable official would have understood that what he is doing violates" the right at issue.  *Armstrong*, 2016 WL 105386, at *13.  It is far from clear that seizing a dog pursuant to a court order and a clear delegation of state authority would implicate the Fifth Amendment's Takings Clause.  Plaintiff has cited no case even approaching such a holding and the Court is aware of none. Accordingly, Newsome is entitled to qualified immunity from individual liability as to Count VI.

To summarize, the Court finds as follows with respect to this count: Count VI is dismissed in its entirety as barred by *Rooker-Feldman*; alternatively, Count VI is dismissed in its entirety for failure to state a claim; alternatively, Count VI is dismissed as to the Board due to *res judicata*; Count VI is dismissed as to Newsome in her official capacity due to *res*

*judicata*; and Count VI is dismissed as to Newsome in her individual capacity as barred by qualified immunity.[14]

F.        Count VII: Failure to Train and Supervise

Finally, the Court turns to Count VII, which alleges that Defendants Burton and Stacks are liable in their individual capacities and official capacities as Animal Control officials for violating § 1983 and the Fourth Amendment.  The specific constitutional violation alleged is a failure to supervise Animal Control employees' use of the RRU to execute search warrants.  (*See* Mem. in Opp'n at 6 ("Count VII is a supervisory liability claim . . . .").)  According to the Complaint, this failure of supervision was in deliberate indifference to the risk that an Animal Control officer, like Newsome, might use the RRU to execute a search warrant in violation of the Fourth Amendment.  (*Id.* ¶¶ 192-93.)

Defendants argue that Count VII fails to state a claim for supervisory liability and, in the alternative, that Burton and Stacks are entitled to qualified immunity in their individual capacities.  The Court agrees as to both grounds and will begin its analysis with the failure-to-state-a-claim argument.

---

[14]     Because of these several bases of dismissal, the Court does not address Defendants' additional argument that the case of *Heck v. Humphrey*, 512 U.S. 477 (1994) bars Count VI.

Alleging a claim of supervisory liability under § 1983 requires a plaintiff to plead the following three elements:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

(2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and

(3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (same). Supervisory liability under this standard "is not based on ordinary principles of *respondeat superior*, but rather is premised on a recognition that supervisor indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001). The Court finds that Plaintiff fails to adequately plead elements one and two.

As to the first element, proving "pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate

32

poses an unreasonable risk of harm of constitutional injury."
*Wilkins*, 751 F.3d at 226.  The only "constitutional injury"
alleged in Count VII, however, is Newsome's decision to deploy
the RRU to execute the warrant to seize Max in October 2013.
(*See* Compl. ¶ 192.)  This single instance of an alleged
constitutional violation fails to plead "widespread" or "several
different" violations.  Therefore, the first element is absent.

As to the second element, Plaintiff does not
adequately plead that Burton or Stacks was deliberately
indifferent to or tacitly authorized the unreasonable use of the
RRU.  This factor imposes a "heavy burden" which ordinarily
requires allegations of "continued inaction in the face of
documented widespread abuses."  *Shaw*, 13 F.3d at 799.  As
described above, Plaintiff has alleged only one unconstitutional
use of the RRU.  Furthermore, there is no allegation that Burton
or Stacks was ever informed of a prior use of the RRU in an
unreasonable way or of Newsome's intention to use the RRU on the
day Max was seized.  Without any allegation that either
Defendant was aware of a prior unconstitutional use of force or
of Newsome's intention to use the RRU on October 1, 2013,
Plaintiff does not sufficiently plead deliberate indifference.
Accordingly, Plaintiff's claim of supervisory liability must be
dismissed for failure to state a claim upon which relief may be
granted.

Furthermore, even if a § 1983 claim was properly alleged in Count VII, Burton and Stacks are qualifiedly immune in their individual capacities.  Because of the nature of a § 1983 supervisor liability claim, Plaintiff must make the following showings to demonstrate the lack of qualified immunity: (1) it was clearly established at the time of Newsome's conduct that Burton and Stacks could be held liable under § 1983 for constitutional violations committed by Newsome; (2) it was clearly established at the time Burton and Stacks were supervising Newsome that Newsome's use of the RRU was unconstitutional; and (3) a reasonable person in Burton and Stacks' position would have known that their actions were unlawful.  *Shaw*, 13 F.3d at 801.  Plaintiff cannot satisfy the second element.

The Court has already concluded that it was not clearly established on October 1, 2013, that Newsome's use of the RRU was unconstitutional.  As described in the qualified immunity analysis for Count V, the application of the Fourth Amendment to pre-search conduct is an unresolved area of law that was not clearly established at the time Max was taken.  Therefore, Plaintiff fails to satisfy element two of the qualified immunity analysis.  Accordingly, Burton and Stacks are qualifiedly immune from liability in their individual capacities.

34

In an effort at clarity, the Court will now summarize
its findings in this case.  First, the Court finds that the
*Rooker-Feldman* doctrine divests subject matter jurisdiction over
Count VI.  All other counts are properly within this Court's
jurisdiction.[15]

Next, the Court finds that Judge Hilton's April 4,
2014 dismissal of a prior version of this case bars all of the
counts against the Board.  This finding disposes of Counts I,
II, III, and IV in their entirety, and Count VI's claims against
the Board.[16]  Additionally, *res judicata* bars Counts V, VI, and
VII to the extent that those counts assert official capacity
claims against Defendants Newsome, Burton, and Stacks.  These
findings leave only the individual capacity claims against
Newsome, Burton, and Stacks remaining.  As to those remaining
individual capacity claims in Counts V, VI, and VII, the Court
finds Newsome, Burton, and Stacks are entitled to qualified

---

[15]    The Court did not consider whether the state-court
judgments bar Plaintiff's counts under a preclusion doctrine
because Defendants did not raise this affirmative defense.  *See
Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 710 F.3d 527,
535 (4th Cir. 2013) ("A court may raise *sua sponte* an
affirmative defense based on preclusion only in 'special
circumstances.'").
[16]    The Court did not consider whether Virginia's one-year
statute of limitations barred Plaintiff's ADA and Rehabilitation
Act claims, *see Thorne v. Hale*, No. 1:08cv601 (JCC), 2009 WL
890136, *4 (E.D. Va. Mar. 26, 2009), because Defendants did not
raise this affirmative defense.  *See Eriline Co. v. Johnson*, 440
F.3d 648, 653 (4th Cir. 2006).

immunity.  Thus, all counts will be dismissed as barred by either *Rooker-Feldman*, *res judicata*, or qualified immunity.

In addition to those dispositive grounds for dismissal, the Court alternatively finds that Counts VI and VII fail to state claims upon which relief can be granted. Therefore, Counts VI and VII will be alternatively dismissed in their entirety pursuant to Rule 12(b)(6).  Because the above bases of dismissal dispose of all of Plaintiff's claims, the Court will dismiss this case.

## IV.   Conclusion

For the reasons stated above, the Court will grant Defendants' motion to dismiss.

An appropriate order will issue.

|                        |                              |
|------------------------|------------------------------|
|                        | /s/                          |
| January 27, 2016       | James C. Cacheris            |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE |

36